[Civ. No. 3418. First Appellate District, Division One.—July 2, 1920.]

CHARLES N. FINK et al., Appellants, v. BESSIE E. LOYNES, as Administratrix, etc., Respondent.

[1] ACCOUNTING—EXISTENCE OF PARTNERSHIP—EVIDENCE.—In an action for a partnership accounting, following the death of one of the partners, neither evidence that a certain business associate of the deceased did not know of the partnership, nor a denial by another person that one of the plaintiffs had been introduced to him as a partner, nor the fact that in conversation with his wife in reference to certain work the deceased spoke of the plaintiffs as foremen, nor the fact that on one occasion the deceased sent one of the plaintiffs an envelope with his name upon it and containing money the same as other employees received, nor the fact that one of the plaintiffs had at one time stated that he and his coplaintiff were foremen for the deceased for a great many years, is inconsistent with the existence of a copartnership between plaintiffs and the deceased; and such evidence will not justify a finding against the existence of such copartnership, as against the direct testimony of the plaintiffs showing the creation and existence of such relationship.

[2] JUDGMENTS—APPEAL—SUFFICIENCY OF COMPLAINT—DEMURRER.— A respondent on an appeal, in whose favor a judgment was rendered after a trial upon the merits, cannot protect his judgment by urging that his demurrer to the complaint ought to have been sustained, unless such complaint was incapable of amendment so as to state a cause of action.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles Wellborn, Judge. Reversed.

The facts are stated in the opinion of the court.

Louis N. Whealton for Appellants.

Frank H. Jaques, Skinner & Jaques, Wheaton A. Gray and Geo. A. Skinner for Respondent.

RICHARDS, J.—This is an appeal by the plaintiffs from a judgment in favor of the defendant in an action for an accounting.

Their principal contention in support of the appeal is that the findings of the court are unsupported by the evidence. The complaint set forth that the plaintiffs had entered into a copartnership or joint venture with the defendant's intestate, Richard Loynes, who died without any settlement or accounting between the parties having been arrived at, and prayed for such accounting. It is the finding of the court against this allegation of copartnership or joint venture which is thus attacked by the appellants.

The evidence in the case upon the subject of the formation and existence of said alleged copartnership is undisputed and is briefly as follows: The plaintiffs, Charles N. Fink and O. Mickelson, were brick-masons and building contractors engaged in business in and around Los Angeles. Richard Loynes was a brick manufacturer and building contractor doing business in Long Beach. In September, 1905, he invited the plaintiffs to go to Long Beach and enter into copartnership with him for the carrying on of a building and contracting business, informing them at the time that that branch of the business was getting too much for him. They acceded to his request and verbally agreed with him to enter into such copartnership, the terms of which were that the business should be conducted in the name of Richard Loynes, that the plaintiffs should devote their time to conducting the building operations while Loynes attended to procuring contracts, keeping the accounts and collecting moneys to become due as the result of the firm's operations. All brick used by the firm was to be supplied by Richard Loynes at the market price, if he chose to supply it, and the profits, if any, arising from the building contracts executed were to be divided equally between the plaintiffs, Loyne's profit to come from sales of brick to the firm, in which sales the plaintiffs had no interest. Loynes was also to finance the enterprise. Settlements were to be had every three months.

The plaintiffs immediately upon the making of this agreement removed to Long Beach, bringing with them their building paraphernalia, consisting of scaffolding, timbers, an electric hoist, a horse and wagon, etc., and during the existence of the partnership these appliances were used in its business. The building operations thereafter conducted by the parties, while quite numerous, were individually in gen-

eral not of great magnitude, and the plaintiffs, being both practical brick-masons, acted as foremen on the jobs and participated in the manual labor of laying the brick. When two jobs were proceeding simultaneously each supervised or acted as foreman on one of them. Each drew from the firm sums of money as he needed them, for which checks were made and signed by Loynes upon their request. These sums of money had no relation to the time each spent upon the work of building, although on some occasions when the contract price was based upon the cost of materials and labor entering into the particular job a record of such time was kept. Account-books relating to the firm's operations were kept by Loynes either personally or with the assistance of a bookkeeper who, in such work, took his instructions exclusively from Loynes. In those books the plaintiffs were charged with the various sums paid to them or paid to others for their account, and they were credited with the irrespective shares of the profit arising from each individual contract. The operations of the parties proceeded thus from the year 1905 to 1914. About three months after their inception the plaintiffs requested of Loynes an account showing what profits, if any, had arisen from the venture, but no account of such was made at the time for the reason given by Loynes that no jobs were then complete. Plaintiffs made similar requests from time to time, but for one reason or another, advanced apparently, however, in perfectly good faith—sickness in the family, misplacement of a book, or the illness of Loynes himself—no settlement of profits was arrived at. The relations of the parties were intimate and perfectly harmonious, they addressing one another as Dick or Charley or whatever the given name might be. In 1914 a change was made in the terms of their business relations, according to which Fink thereafter had the superintendence of one piece of work, and Mickelson of the next, the profit, if any, arising from a particular contract going to the one having the superintendence of its execution. In other respects the arrangement remained the same, there being in reality now two separate partnerships, although, apparently, the significance of the change was not apparent to the parties, and we find in this an illustration of the informality which all the way through characterized their dealings.

In 1917 Loynes died, no settlement of the partnership affairs either up to 1914 or thereafter having ever been had. The defendant, surviving widow of Loynes, as administratrix of her husband's estate, took possession of the books, assets, and properties of her husband, and of the firm of which he was a member, including building appliances belonging individually to the plaintiffs, and being apparently ignorant of the precise nature of the business arrangements between the plaintiffs and the deceased she denied the existence of any partnership, claimed that the plaintiffs were but employees of her deceased husband, and refused to account to them for any assets of the association.

The defendant's evidence in opposition to this uncontradicted showing was very brief, and may be narrated in detail:

W. J. Morrison, president of the bank of which the deceased was a director and in which he carried an account, was asked: "Do you know whether or not he [Richard Loynes] ever had any partners?" to which he replied: "Not to my knowledge."

A stipulation was entered into between the plaintiffs and the defendant at the trial that an absent witness, if called, would testify that the plaintiff Fink had not been introduced to him as a partner of the deceased. This evidence was offered in contradiction of a statement of said plaintiff in which he mentioned said absent witness as one of a number of persons to whom the deceased had introduced him as a partner.

Mrs. Loynes, a hostile witness, testified: "In referring to the work such as that he always spoke of these men as foremen."

Louis J. Kelly testified that on one occasion when he took to the plaintiff Mickelson a number of envelopes containing the men's wages, one of such envelopes was marked with Mickelson's name.

George Phillipson testified: "I have heard Mr. Fink state at one time him and Mr. Mickelson was foremen for Mr. Loynes for a great number of years. . . . That was the time they were dissolving the partnership . . . the day that Fink and Mickelson dissolved partnership."

Finally, the defendant's son, a boy, testified: "There was a man on the pier and he said to another man, 'Whose boat

is that?' And this other man told him, 'That is Charley Fink's, foreman for Dick Loynes. He is a brickman. He don't know anything about boats.' But after that I was down looking at the boat, and I said to Mr. Fink, 'This man out here don't think much of your ability as a sea captain,' and he says, 'How is that?' so I told him that this man had said that you were Charley Fink, Dick Loynes' foreman, and didn't know anything about boats, and he laughed; he did not contradict when I told him he was a foreman.''

[1] It will thus be seen that the entire evidence upon which the finding of the court, that the alleged partnership did not exist, is based, is that a certain business associate of the deceased did not know of it; a denial by another person that one of the plaintiffs had been introduced to him as a partner; the fact that in conversation with his wife the deceased in referring to certain work spoke of the plaintiffs as foremen; the incident of the sending to Mickelson of an envelope with his name upon it and containing money; the statement attributed to Fink. that he and Mickelson were foremen for the deceased for a great many years, and the boatman's quizzical reference to Fink as a poor sailor in which he designated him as Dick Loynes' foreman.

It requires no critical analysis of this testimony offered by the defendant to demonstrate that there is nothing therein contradictory of the formation and existence of the alleged partnership directly testified to by the plaintiffs and conclusively established by the books of account of the deceased. It appears to us that there was nothing anomalous in the firm's business being conducted in the name of Richard Loynes exclusively. It was an established going concern at the time of the plaintiff's admission to it; Loynes was financing the undertaking, and great informality characterized the dealings of the parties all the way through. Except for the purpose of satisfying the *amour propre* of the plaintiffs (of the existence of which to any marked degree there is no evidence in the record) there was no reason why they should desire the name by which the business was already known to be changed. The fact that they sometimes referred to themselves as foremen for Loynes, and that the latter also at times so designated them, is sufficiently explained by the circumstances that they in fact throughout the duration of the partnership acted in this capacity. It is

obvious that by so doing their contractual relations to Loynes were not changed. No inference contrary to the existence of the alleged partnership is to be drawn from the receipt by Mickelson of an envelope containing money, as testified by Kelly, for it is made clear by the testimony of Mickelson that at times when in charge of a job a laborer would leave his employment before the end of the week, in which case Mickelson, instead of sending him to the office for the money due him, would himself pay him and would be reimbursed for this outlay in the manner indicated by Kelly. And finally, the boy's narration to Fink of his conversation with the boatman, and which testimony was offered as an admission against interest, was in fact no such admission, as the circumstances under which the narration was made were not such as to call for any response from Fink. The whole of this evidence offered by the defendant is entirely consistent with the existence of the copartnership claimed by the plaintiffs; and in our opinion it affords no foundation for the finding of the court in question.

This view of the evidence necessitates the reversal of the judgment, unless the respondent is correct in her contention that it should be affirmed for the reason that the complaint fails to state a cause of action, and that her demurrers thereto, general and special, were improperly overruled.

[2] Without stopping to consider what effect should be given to the circumstance that the record on appeal discloses no such demurrers nor order of the court thereon, it is settled by recent decisions of our supreme court that the respondent on an appeal, in whose favor a judgment has been rendered after a trial upon the merits, cannot protect his judgment by urging that his demurrer to the complaint ought to have been sustained, unless such complaint were incapable of amendment so as to state a cause of action. In this respect he is not in the position he would be if he were himself appealing from the judgment (*Ransome-Crummey Co.* v. *Bennett,* 177 Cal. 560, [171 Pac. 304], and cases cited).

Judgment reversed.

Waste, P. J., and Welch, J., *pro tem.,* concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on July 27, 1920, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 30, 1920.

Lawlor, J., Wilbur, J., Lennon, J., and Olney, J., concurred.